IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KENNETH M. DICKERSON, SR. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:11CV1 |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Kenneth Dickerson ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income on August 7, 2006, alleging a disability onset date of July 6, 2006. (Tr. at 106-18.)[2] His

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Administrative Transcript of Record filed manually with the Commissioner's Answer [Doc. #8].

applications were denied initially (Tr. at 45-46) and upon reconsideration (Tr. at 47-48). Thereafter, he requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. at 67-68). On June 9, 2009, Plaintiff, along with his non-attorney representative, appeared and testified at the hearing (Tr. at 9). The ALJ ultimately determined that Plaintiff was not disabled within the meaning of the Act (Tr. at 18) and, on November 18, 2010, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-3).

In rendering his disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2009.
>
> 2. The claimant has not engaged in substantial gainful activity since July 6, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
> . . . .
>
> 3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, borderline intellectual functioning, and obesity (20 CFR 404.1520(c) and 416.920(c)).
> . . . .
>
> 4. The claimant does not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).
> . . . .
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a significant range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours in an 8-hour day. The claimant can frequently climb, balance, kneel, and crawl and occasionally stoop and crouch. He is limited to the performance of routine and repetitive tasks.

(Tr. at 11-13.)

The ALJ then considered the vocational expert's testimony regarding the above residual functional capacity ("RFC") and determined that, although Plaintiff was unable to perform any of his past relevant work, he could perform other jobs that exist in significant numbers in the national economy. (Tr. at 17.) Plaintiff therefore was not under a "disability," as defined in the Act, from his alleged onset date through the date last insured. (Tr. at 18.)

II.    LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical. " Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since his alleged onset date. He therefore met his burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments: degenerative disc disease of the lumbar spine, borderline intellectual functioning, and obesity. (Tr. at 11.) Although the ALJ found at step three that these impairments did not meet or equal a disability listing, he determined that Plaintiff could perform only light work with further restrictions, such that he could not return to his past relevant work under step four of the analysis. (Tr. at 12-17.) However, the ALJ concluded at

---

[5] A claimant thus can qualify as disabled via two paths through the five-step sequential evaluation process. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.

step five, that, given Plaintiff's age, education, work experience, and RFC, he could perform other jobs available in the community and therefore was not disabled. (Tr. at 17.)

Plaintiff now argues that substantial evidence fails to support the ALJ's decision in two related respects. First, Plaintiff contends that the ALJ erred in finding that Plaintiff has a limited education when the record instead supports a finding that Plaintiff is functionally illiterate. (Pl.'s Br. [Doc. #12] at 5.) Second, Plaintiff challenges the ALJ's finding that his mental impairment does not meet the requirements of 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C) (hereinafter "Listing 12.05(C)"). (Id. at 7.) Plaintiffs contentions overlap to some degree, and the Court will first address Plaintiff's contentions regarding Listing 12.05(C).

  A.  Listing 12.05(C)

On appeal, Plaintiff claims that the ALJ failed to properly evaluate whether his mental impairment met the requirements of Listing 12.05(C). He argues that substantial evidence of (1) his low IQ scores and (2) deficits in his adaptive functioning levels, support a finding of intellectual disability[6] and, therefore, disability, at step three of the sequential analysis.

Listing 12.05(C) provides that:

> [i]ntellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifesting during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for the disorder is met when the requirements in A, B, C, or D are satisfied.
> . . . .

---

[6] On August 1, 2010, while this case was pending, the Social Security Administration amended Listing 12.05 by replacing the words "mental retardation" with "intellectual disability." See 78 Fed. Reg. 46499, 46501 (codified at 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05).

7

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C). In other words, a claimant must demonstrate three elements to meet Listing 12.05(C):

> 1) "a showing of deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22 (Prong 1)," Hancock v. Astrue, 667 F.3d 470, 473 (4th Cir.2012) (internal quotation marks omitted);
>
> 2) "a valid verbal, performance, or full scale IQ of 60 through 70 (Prong 2)," id. (internal quotation marks omitted); and
>
> 3) "a physical or other mental impairment imposing an additional and significant work-related limitation of function (Prong 3)," id. (internal quotation marks omitted).

In the present case, the parties agree that Plaintiff established the second and third prongs of the Listing. Plaintiff's verbal IQ score of 68 and full scale IQ score of 70 both meet the Listing's IQ requirement, while his degenerative disc disease and obesity unquestionably meet the additional severe impairment requirement. Therefore, the sole issue before the Court is whether substantial evidence supports the ALJ's finding that Plaintiff did not manifest deficits in adaptive functioning before age 22. As to this requirement, the Fourth Circuit has noted that Prong 1 itself involves two parts, and if the ALJ finds: (1) "no deficits in adaptive functioning generally," and (2) "no deficiency manifested itself before the age of 22," then "[e]ither finding alone, if supported by substantial evidence, would be sufficient to support the conclusion that [the claimant] did not satisfy Prong 1." Hancock, 667 F.3d at 475.

8

In the present case, the ALJ's adverse finding at Prong 1 of Listing 12.05(C) rested on the following factual predicates:

> School records generally indicate that the claimant earned below average marks with multiple absences. The claimant indicated that he missed school frequently as his father made him work on a farm. . . . The undersigned notes that a diagnosis of borderline intellectual functioning may not include any finding of deficits in adaptive functioning, and, therefore, a finding that the claimant suffers from borderline intellectual functioning may not satisfy the diagnostic requirements set out in Listing 12.05. Such a finding is supported in this case in light of the claimant's work history as a truck driver, concrete pourer, forklift operator, janitor, landscaper, and daycare teacher, with at least moderate earnings. Following a thorough review of the evidence of record, the undersigned has determined that the claimant suffers from no more than mild limitations in his activities of daily living, mild limitations in his social functioning, moderate limitations in his concentration, persistence, and pace, and no episodes of decompensation. The claimant had no difficulty testifying at his hearing and used a good vocabulary. Moreover, some of the jobs he performed in the past were at the skilled and semi-skilled level, including work as a truck driver, machinery operator, and daycare teacher. Treatment notes indicate that the claimant was able to drive, care for himself, possibly work following his alleged onset date, and participate in medical testing. Additionally, he was able to watch television, handle his finances, and get along well with others.

(Tr. at 12-13.)

According to Plaintiff, the ALJ erred in his analysis by improperly (1) ignoring evidence of Plaintiff's functional illiteracy, (2) suggesting that Plaintiff's work history undermined a finding that Plaintiff had deficits in adaptive functioning, and (3) interpreting the lack of a mental retardation diagnosis as evidence that Plaintiff did not have such an impairment. Ultimately, none of theses challenges alter the supportability of the ALJ's decision. Moreover, after comparing the evidence relied on by the ALJ with adaptive abilities and deficits described in both the Listings and the relevant case law, the Court finds that the factual findings in this case provide a sufficient basis to sustain the ALJ's finding at Prong 1 of Listing 12.05(C).

9

First, and contrary to Plaintiff's assertion, the ALJ clearly considered Plaintiff's limited reading ability, specifically noting that he "was found to read, write, and solve mathematical equations at the 2nd grade level," and "was able to spell the words 'heaven' and 'grown.'" (Tr. at 16.) Plaintiff presents no evidence that an ALJ, having made such a finding, is further required to label Plaintiff as "functionally illiterate" or otherwise in order for substantial evidence to support his determination at step three.[7] Cf. Caldwell v. Astrue, No. 1:09cv233, 2011 WL 4945959, at *3 (W.D.N.C. Oct. 18, 2011); Parks v. Colvin, No. 5:13-868, 2014 WL 4199055 at *12-13 (D.S.C. Aug. 20, 2014).

Plaintiff's next challenges the ALJ's reliance on his work history, arguing that the ALJ placed undue reliance on his past jobs and mischaracterized several positions as skilled or semi-skilled, rather than unskilled. (Pl.'s Br. [Doc. #12] at 9.) He further contends that the ALJ erred in failing to develop the record on this issue by eliciting testimony about specific job duties, Plaintiff's behavior on the job, and the circumstances surrounding his termination from various jobs. (Pl.'s Resp. Br. [Doc. #17] at 7.) Notably, Plaintiff testified at his hearing that he frequently changed jobs, "didn't have enough education" for at least one job, and was possibly laid off on a couple of other occasions. (Tr. at 38-39.) However, the record clearly reflects that he experienced no significant gaps in his adult employment (see Tr. at 126-29), held his last job for several years (Tr. at 42, 128), and, as noted by the ALJ, sustained "at least moderate earnings" (Tr. at 12-13). Plaintiff also reported during his consultative examination "that he

---

[7] Plaintiff additionally argues that, at step five of the sequential analysis, the ALJ should have categorized him as functionally illiterate rather than as having a limited education, and that such a change in category would impact the disability determination at that step of the analysis. The Court addresses Plaintiff's step five argument separately in subsection B of this recommendation.

10

never had any problems on his jobs, obeyed rules and regulations, [and] got along with coworkers and with supervisors" (Tr. at 227.) In terms of the skill levels required for Plaintiff's past employment, the ALJ elicited testimony that many, if not all, of Plaintiff's jobs involved operating machinery, including trucks, forklifts, and lawnmowers. (Tr. at 12-13, 17, 38-41.) Plaintiff, who bears the burden at step three of the sequential analysis, presents no evidence that these jobs failed to meet the definition of semi-skilled work.[8] At the very least, Plaintiff's ability to professionally operate a variety machines on a professional basis, regardless of skill level, supports the ALJ's ultimate finding that Plaintiff failed to manifest sufficient deficits in adaptive functioning to meet the first prong of Listing 12.05(C), particularly when considered in conjunction with the evidence as a whole.

The ALJ was similarly entitled to consider the lack of a mental retardation diagnosis at step three of his analysis. As Defendant correctly notes, a diagnosis of mental retardation is not required to satisfy Listing 12.05; however, the absence of such a diagnosis can be evidence that a plaintiff does not meet the listing. Plaintiff, in turn, acknowledges this point, but argues that "all such cases are fact specific, and [that] the issue, in any event, is not whether there is a diagnosis of mental retardation but whether Plaintiff has produced evidence of adaptive functioning that were manifested before age 22." (Pl.'s Resp. Br. at 3.) To this end, the Court

---

[8] The definition of semi-skilled work in regulations sections 20 C.F.R. §§ 404.1568(b) and 416.968(b) provides that semiskilled jobs "may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but are more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."

11

now turns more generally to the question of what constitutes deficits in adaptive functioning sufficient to meet Prong 1 of the Listing.

Notably, Listing 12.05(C) "does not expressly define 'deficits in adaptive functioning' or specify the degree of deficit required (mild versus significant, for example), whether deficits must exist in one, two, or more categories of adaptive functioning, or what methodology should be used to measure deficits in adaptive functioning." Blancas v. Astrue, 690 F. Supp. 2d 464, 476-477 (W.D. Texas 2010). However, "'[a]daptive activities' are described elsewhere in the [Mental Disorders] Listing . . . as 'cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [one's] grooming and hygiene, using telephones and directories, and using a post office.'" Id. at 476 (quoting 20 C.F.R. part 404, subpt. P, Appendix 1, § 12.00(C)(1)); see also Hawley v. Astrue, No. 1:09CV246, 2012 WL 1268475, at *5 (M.D.N.C. April 16, 2012) (unpublished). The factfinder may consider "the extent to which [the claimant is] capable of initiating and participating in activities independent of supervision or direction." 20 C.F.R. part 404, subpt. P, Appendix 1, § 12.00(C)(1). Social functioning, such as the claimant's ability to get along with others, and limitations in concentration, persistence, or pace, particularly in the workplace, may also impact determinations. 20 C.F.R. part 404, subpt. P, Appendix 1, § 12.00(C)(2)-(3).

Here, the record, as cited by the ALJ, fails to show that Plaintiff is significantly deficient in any of the above areas. In fact, Plaintiff's DDS Psychological Evaluation noted that he had "his own residence and managed his own finances," and "likely could function independently" in the absence of his physical limitations. (Tr. at 13, 227). He is married, has raised four

children to adulthood, and currently lives with his wife and two young grandchildren. (Tr. at 14, 26, 227.)  Plaintiff is not only able to drive, but, as noted in the ALJ's decision, has driven professionally. (Tr. at 12-13.) Although the ALJ acknowledged that Plaintiff "was diagnosed with a learning disorder and borderline intellectual functioning," reportedly "required special education services while in school," and "was found to read, write, and solve mathematical equations at the 2nd grade level," he did not find these deficits, without more, satisfied the diagnostic requirements set out in Listing 12.05(C). (Tr. at 12, 16-17, 229-30.)  In fact, the ALJ concluded, "in light of the limited intervention and help the claimant has needed as a result of [his mental] impairment and as a result of his activities of daily living described throughout this decision," that Plaintiff required no more than a limitation to routine and repetitive tasks. (Tr. at 17.)

A comparison of Plaintiff's adaptive abilities and deficits with those of similarly situated plaintiffs in Hancock v. Astrue, 667 F.3d 470 (4th Cir. 2012) and other cases from within our Circuit further supports the ALJ's step three determination in the present case.  In Hancock, the Fourth Circuit determined that the plaintiff failed to meet her burden at the first prong of Listing 12.05(C) where she had "the ability to shop, pay bills, and make change," "[took] care of three small grandchildren at a level of care that satisfies the Department of Social Services, . . . does the majority of her household's chores, including cooking and baking, . . . is attending school to obtain a GED," and "does puzzles for entertainment." Id. at 476.[9]

---

[9]As noted in Hawley, 2012 WL 126875, at *5 n.7, Hancock "provides a valuable comparison standard for assessing an ALJ's findings regarding Prong 1's adaptive functioning requirement, but does not identify an outer boundary in this context."  In other words, the Fourth Circuit "did not intimate that [Hancock's] capabilities
(continued...)

13

Relying on Hancock, this Court found in Hawley that a plaintiff failed to meet her burden under prong one where she was "the head of her household and responsible for three children in school," had "no difficulties caring for her personal needs, performing household chores, preparing meals or in caring for her family," "handle[d] her own finances," and "has demonstrated the ability to ask questions for help when needed, take public transportation, . . . [do] grocery shopping, [and attend a] church study group." 2012 WL 1268475, at *5; see also Russell v. Colvin, 3:13cv524, 2014 WL 4258260, at *12 (E.D. Va. Aug. 27, 2014) (unpublished) (finding "that the record failed to demonstrate deficits in adaptive functioning manifesting before the age of 22, because Plaintiff could tend to his personal needs, care for his child, manage his finances, drive and go out alone"); Caldwell v. Astrue, 2011 WL 4945959, at *3.

Therefore, after considering the ALJ's findings in the present case in the context of both the regulations and the above case law, the Court concludes that substantial evidence supports the ALJ's determination at step three of the sequential analysis.

B.  Education Level

In his second, related argument, Plaintiff challenges the ALJ's finding that he has a limited education, and instead argues that he is functionally illiterate. Plaintiff contends that the ALJ incorrectly based his finding on his highest numerical grade level rather than the evidence of his actual abilities, which showed only second grade reading and writing skills. (Pl.'s Br. at 6.)

---

⁹(...continued)
constituted the minimum that would suffice to support" a finding of an absence of deficits in adaptive functioning. Id.

Findings regarding education as a vocational factor come into play at step five of the sequential analysis, where the ALJ consults the medical-vocational guidelines, or "grids," contained in 20 C.F.R. Chapter III, Part 404, Subpart P, Appendix 2 to establish Plaintiff's ability to perform other work available in the national economy. Significantly, neither the regulations defining education as a vocational factor nor the grids themselves employ the term "functionally illiterate." Rather, the grids utilize the phrases:

> "Illiterate or unable to communicate in English,"
> "Limited or less - at least literate and able to communicate in English," and
> "Limited or less"

to describe the education levels required for the work levels at issue here. 20 C.F.R. pt. 404 subpt. P, Appendix 2, Table Nos. 1 and 2. The regulations further explain that:

> Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though that person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

20 C.F.R. § 404.1564(b)(1). "Marginal education" and "Limited education" are then defined as follows:

> Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.
> . . .
>
> Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

20 C.F.R. § 404.1564(b)(2)-(3).

15

In the present case, the ALJ relied on grid Rules requiring that Plaintiff have a "Limited or less" education, which would include a "Limited education" or a "Marginal education." See 20 C.F.R. Chapter III, Part 404, Subpart P, Appendix 2, § 202.18, § 202.17. Substantial evidence supports the conclusion that this category reflects Plaintiff's education level, based on the analysis set out in the ALJ's decision. To the extent that Plaintiff contends that he is illiterate and does not meet even the requirements for a "Marginal education," the Court concludes that there is substantial evidence that Plaintiff does not meet the definition of "illiterate" under the regulations, as he can read and write at the second grade level, including spelling words such as "heaven" and "grown." In fact, Plaintiff's adult function report specifically provides that he requires written, rather than oral, instructions to stay on task, and indicates that he follows such instructions "pretty well." (Tr. at 162.) Therefore, substantial evidence supports the ALJ's determination at step five.[10]

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #11] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #13] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 18th day of February, 2015.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

---

[10] Moreover, as noted by Defendant, even if Plaintiff were considered illiterate, and even if his prior work were treated as unskilled, the grid Rules would still support a finding that Plaintiff is not disabled. See 20 C.F.R. Chapter III, Part 404, Subpart P, Appendix 2, § 202.16.